IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| FORTRESS SYSTEMS LLC<br><br>     Plaintiff,<br><br>v.<br><br>GENERAL NUTRITION CORPORATION<br>and GENERAL NUTRITION CENTERS<br>INCORPORATED,<br><br>     Defendants. | CIVIL NO.<br><br><br>VERIFIED COMPLAINT<br>JURY TRIAL DEMANDED |

The Plaintiff in the above-captioned matter, Fortress Systems LLC, submits the following as its Verified Complaint against the Defendants, General Nutrition Corporation and General Nutrition Centers Incorporated.

## **COMPLAINT**

### **Nature of the Case**

1.     This is an action for patent infringement under the laws of the United States, as provided by the Title 35 U.S.C. § 271.

2.     Plaintiff seeks to permanently enjoin Defendants' patent infringement under 35 U.S.C. section 283 and seeks actual damages attributable to infringement, Defendants' profits attributable to infringement, Plaintiff's interests and costs pursuant to 35 U.S.C. section 284, and attorney's fees pursuant to 35 U.S.C. section 285.

### **Parties**

3.     Plaintiff Fortress Systems LLC is a Nebraska limited liability corporation with its principal place of business at 2132 South 156th Circle, Omaha, NE 68130.  Michael Carnazzo is the president of FSI.

4.     On information and belief, Defendant General Nutrition Corporation is a Delaware corporation, with its principal place of business at 300 Sixth Avenue, Pittsburgh, PA 1522.

5.     On information and belief, Defendant General Nutrition Centers Incorporated is a Delaware corporation, with its principal place of business at 300 Sixth Avenue, Pittsburgh, PA 1522 (the Defendants are hereinafter collectively referred to as "GNC".)

## Jurisdiction and Venue

6.     This is an action for patent infringement based on 35 U.S.C. section 271, and this Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1338(a).

7.     Personal jurisdiction is based on Federal Rule of Civil Procedure 4(e), and on sufficient minimum contacts between the Defendant and this jurisdiction such that the exercise of personal jurisdiction by this Court comports with the applicable state, federal, and constitutional requirements.  To that end, Defendants maintain contact with this jurisdiction, do business in this jurisdiction, maintain a world wide website, www.gnc.com, that is accessible to citizens of this jurisdiction for purchasing the allegedly infringing products discussed herein, and commit in this jurisdiction certain acts alleged herein to constitute the violations of Plaintiff's rights.

8.     Venue in this Court is proper pursuant to 28 U.S.C. section 1391 and 28 U.S.C. section 1400 since Plaintiff FSI resides in this judicial district and Defendants GNC reside in this judicial district by virtue of its doing business in this district, and since acts of which Plaintiff complains occurred in this district.

## Factual Background

9.     Plaintiff FSI is the assignee and owner of U.S. Letters Patent 5,925,368 entitled

2

Method for Enhancing Delivery and Uniformity of Concentration of Cellular Creatine, duly and legally issued on July 20, 1999 (hereinafter referred to as "U.S. 5,925,368"). This patent is in full force and effect to this day and Fortress Systems has the right to enforce this patent. A copy of U.S. 5,925,368 is attached as Exhibit A.

10.    U.S. 5,925,368 covers the use of the combination of creatine and an effervescent to deliver creatine in a human.

11.    Plaintiff FSI and Defendant General Nutrition Corporation had entered into a now expired Development and Supply Agreement whereby General Nutrition Corporation would sell a product covered by U.S. 5,925,368. *See* Exhibit B, ¶ 12 attached.

12.    On information and belief, Defendants produce and sell products containing creatine and an effervescent in infringement of certain claims of U.S 5,925,378, including without limitation claims 9, 11, and 13-17, a copy of the product information for Defendants' product and a copy of the product label are attached as Exhibit C.

13.    On information and belief, Defendants, by producing and selling products that infringe U.S. 5,925,378, induce infringement of certain claims of U.S 5,925,378, including without limitation claims 1, 4, and 6-8. *See* Label Instructions, Exhibit C.

14.    On information and belief, Defendants will continue to infringe and induce infringement of U.S. 5,925,378 unless enjoined by this Court.

15.    Actual notice of U.S. 5,925,378 and the allegations of infringement were provided to Defendants by electronic mail pursuant to a telephone conversation regarding infringement of U.S. 5,925,378. *See* E-mail, Exhibit D. Defendants were also provided notice of U.S. 5,925,378 via the Development and Supply Agreement, Exhibit B, ¶ 12. It is therefore believed that Defendants have both constructive and actual notice of Plaintiff's U.S. 5,925,378and in particular

3

that U.S. 5,925,378 was duly and legally issued, and it is also aware of, or should have been aware of, the fact that Defendants' products infringe U.S. 5,925,378.

16.     Plaintiff has demanded the Defendants cease infringement, but Defendants have refused to cease producing and selling infringing products and cease inducing infringement. The Defendants' action are without authorization from Plaintiff and are and have been willful and wanton.

## Count I

## Patent Infringement of U.S. 5,925,368

17.     Plaintiff restates and incorporates by reference herein paragraphs 1 through 16 of this Complaint.

18.     Upon information and belief, Defendants knowingly and willfully produce and sell products that infringe patent U.S. 5,925,368 under 35 U.S.C. section 271(a)(c).

19.     Upon information and belief, Defendants knowingly and willfully induce infringement of patent U.S. 5,925,368 by selling products the directed use of which infringe combinations and methods of use claimed in patent U.S. 5,925,368 under 35 U.S.C. section 271(b).

20.     Upon information and belief, Defendants continue to infringe Plaintiff's patent U.S. 5,925,368, and unless preliminarily and permanently enjoined by this Court, Defendants will continue to infringe said copyrights, all to Plaintiff's irreparable injury.  Plaintiff is without adequate remedy at law.

## Count II

## Demand for Relief

WHEREFORE, the Plaintiff FSI, prays this Court for the following relief:

a)      an injunction against the Defendants and their officers, directors, agents, servants, employees, licensees, successors, assigns, and all those controlled by them, or in active concert or participation with them, permanently enjoining them from further infringing patent U.S. 5,925,368;

b)      an award of damages on each Count, and with respect to Count I, a trebling of damages due to the knowing, willful, and wanton nature of the Defendants' conduct;

c)      an award of Plaintiff's attorneys' fees and costs in this action under any and all applicable statutes, including without limitation 35 U.S.C. section 285;

d)      an award of prejudgment interest from the date of first patent infringement to entry of judgment; and

e)      such other and further relief as this Court deems equitable under the circumstances, including where appropriate punitive damages for the Defendants' conduct.

FORTRESS SYSTEMS LLC, Plaintiff

By:    *s/Camille L. Urban*
     Michael A. Dee  PK0014960
     Camille L. Urban PK0015919
     Adam W. Jones PK0018330
     BROWN, WINICK, GRAVES GROSS,
     SCHOENEBAUM AND BASKERVILLE
     4500 Westown Pkwy, Suite 277
     West Des Moines, Iowa 50266
     Telephone (515) 242-2400
     Fax:  (515) 242-2488

By: ___s/Michael W. Pirtle_____
    Michael W. Pirtle, #15738
    Gross & Welch, P.C., L.L.O.
    1500 Omaha Tower
    2120 South 72nd St.
    Omaha, NE  68124
    (402) 392-1500
    (402) 392-1538 - fax

## **VERIFICATION**

Michael Carnazzo does hereby declare and state: I the president of Fortress Systems LLC in the above action; I have read the foregoing Verified Complaint and know the contents thereof to be true, except as to those matters therein stated on information and belief, and as to those matters I believe them to be true.

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: _August 1ˢᵗ_, 2006

Michael Carnazzo
President, Fortress Systems LLC

7



US005925378A

# United States Patent [19]

## Carnazzo

[11] Patent Number: 5,925,378

[45] Date of Patent: Jul. 20, 1999

[54] **METHOD FOR ENHANCING DELIVERY AND UNIFORMITY OF CONCENTRATION OF CELLULAR CREATINE**

[75] Inventor: Joseph W. Carnazzo, Boys Town, Nebr.

[73] Assignee: Fortress Systems, L.L.C., Omaha, Nebr.

[21] Appl. No.: 08/829,198

[22] Filed: Mar. 31, 1997

[51] Int. Cl.$^6$ ........................................ A61K 9/46
[52] U.S. Cl. ........................... 424/466; 424/489; 424/464
[58] Field of Search ................................... 424/466, 489, 424/273, 48

[56] **References Cited**

U.S. PATENT DOCUMENTS

4,255,438   3/1981   Kane et al. .............................. 424/273

4,390,523   6/1983   Huchette et al. .......................... 424/48

*Primary Examiner*—Thurman K. Page
*Assistant Examiner*—William E. Benston, Jr.
*Attorney, Agent, or Firm*—Zarley,McKee,Thomte,Voorhees & Sease; James A. Napier

[57] **ABSTRACT**

A method for enhancing a stable concentration of cellular creatine in a human includes dissolving an effervescent containing an acidic edible salt form of creatine in water. Once the mixture has completely dissolved the solution is immediately ingested, and an effective amount of creatine is absorbed. Preferably, the effervescent is in the form of a tablet which contains creatine in the form of an edible salt, a mixture of acids, and sodium.

**19 Claims, No Drawings**

Exhibit A

5,925,378

# 1

## METHOD FOR ENHANCING DELIVERY AND UNIFORMITY OF CONCENTRATION OF CELLULAR CREATINE

### TECHNICAL FIELD

The present invention relates generally to oral nutritional supplements, and more particularly to a method for enhancing a stable concentration of cellular creatine in a human.

### BACKGROUND OF THE INVENTION

Creatine oral supplementation has been used in the prior art to increase creatine and creatine phosphate (also called phosphocreatine) stores, which are needed for high energy phosphorus metabolism. Creatine, along with dietary carbohydrates, fats, proteins, and other compounds, is a central component of the metabolic system, and is involved in the provision of energy for work and exercise performance. Phosphocreatine helps provide Adenosine TriPhosphate (ATP) during short bursts of high intensity exercise, and it has been found that the depletion of phosphocreatine has been associated with the onset of fatigue. It has been recently discovered that the phosphocreatine pool in skeletal muscle is expandable. This has led to the oral supplementation of creatine and phosphocreatine to increase the levels of these components in muscle, to thereby enhance exercise performance during intermittent activities which require strength and power.

Recovery after high intensity exercise involves a resynthesis of phosphocreatine, which occurs via an oxygen-dependent process with half-life of about 30 seconds. During short-term high intensity intermittent exercise, the active muscles rely heavily on phosphocreatine for production of ATP. The rate of phosphocreatine resynthesis can be accelerated by the use of creatine supplementation in subjects who demonstrated an increase in creatine concentration. The benefits of creatine supplementation are particularly evident in high intensity activities that are intermittent in nature.

Creatine is synthesized from amino acids in the liver, pancreas and kidney, by the transfer of the guanidine moiety of arginine to glycine, which is then methylated to form creatine. Creatine which is synthesized in the liver, pancreas and kidney, is released into the bloodstream and actively taken up by the muscle cells, using the Na+ gradient. Oral creatine is absorbed, unchanged, from the intestinal lumen and passes directly into the bloodstream. The cellular creatine concentration is determined by specific transporters, which transport creatine into the cell against its concentration gradient.

The creatine transport protein has an increased affinity for creatine and concentrates creatine within the cell. Once inside the cell, very little creatine is lost (approximately 2 grams per day in a 70 kg male). Based upon this information, it follows that small increases of plasma creatine (which can occur with creatine supplementation) result in increased transport activity. The loss of creatine from skeletal muscle is typically about 3% per day, which closely matches the amount of creatinine produced non-enzymatically by living human muscle. The main mechanism by which creatine is lost, is the conversion of creatine to creatinine, which is an irreversible non-enzymatic process. Thus, creatine lost from a cell is considered to be negligible, and the concentration of creatine in the cell is not at risk of depletion by virtue of exercise. Thus, the main advantage of creatine administration is in the fact that cellular creatine concentration is stable and not prone to being lost.

The most commonly used creatine supplement for oral consumption, is creatine monohydrate. Creatine monohy-

# 2

drate supplementation at a dosage of 20 grams per day for a 5 day period has been the standard used during most studies in humans. Conventionally, creatine monohydrate is dissolved in approximately 300 milliliters of warm to hot water, the increased water temperature thereby increasing the solubility of creatine monohydrate. It has been found that creatine is not decomposed in the alimentary tract after oral administration, since there is no appreciable increase in urinary urea or ammonia. The results obtained for the conversion of retained creatine to creatinine have led researchers to believe that creatine is completely absorbed from the alimentary tract, then carried to the tissues, and thence either stored in the tissues or immediately rejected and eliminated by way of the kidneys.

The main problem with existing creatine supplementation is in the ability to provide consistent uniform results. It is believed that these inconsistent results arise because of the current methods of delivering creatine to the human body area. Current creatine oral supplementation, as discussed above relies on the use of creatine in powder form which is dissolved in water and then taken orally. However, creatine in powder form does not dissolve well in water or other neutral pH liquids. While increasing the temperature of the water increases the solubility of creatine monohydrate, there is still no consistency in the amount of creatine which is effectively dissolved in the water. For this reason, the consumer will take in varying amounts of creatine when consuming the water.

### SUMMARY OF THE INVENTION

It is therefore a general object of the present invention to provide a method for delivering precise unit dosages of creatine to the human body.

Another object of the present invention is to provide a method of delivering creatine in the form of an oral supplement in a more readily absorbable form than prior art powders.

Still another object is to provide a creatine oral supplement which is highly soluble, absorbable, and provides consistent, uniform, and accurate delivery of the creatine to the human cells.

These and other objects of the present invention will be apparent to those skilled in the art.

The method for enhancing a stable concentration of cellular creatine in a human includes dissolving an effervescent containing an acidic edible salt form of creatine in water. Once the tablet has completely dissolved the solution is ingested, and an effective amount of creatine is absorbed. Preferably, the effervescent is in tablet form and contains creatine in the form of an edible salt, a mixture of acids and sodium bicarbonate, which release carbon dioxide when dissolved in the water.

### DESCRIPTION OF THE PREFERRED EMBODIMENT

The inventors herein have discovered that creatine may be uniformly and accurately dispensed when completely dissolved in liquid. More specifically, the creatine has been created in the form of an effervescent in tablet or granular powder form which reduces the pH of water to thereby increase the solubility of the creatine in the liquid.

Creatine monohydrate, as used in the prior art, has a neutral pH which does not readily dissolve in water or other neutral pH liquids. The use of an acidic edible salt form of creatine, having a pH of approximately 4–5, makes the

Exhibit A

5,925,378

3

creatine much more soluble in the liquid form. The increase in solubility gives a much more uniform absorption of the creatine after ingestion.

In addition, because the creatine is packaged in either tablet or powder form, a precise amount of the compound is dissolved in the liquid, and ingested. The powder form used in the prior art required the consumer to scoop out predetermined amounts of the product and dissolve the product in water. The measuring process is typically inaccurate at the consumer level, since the typical consumer will not use precise measuring instruments to create the solution.

Because prior art formulations of creatine used creatine monohydrate in a neutral pH liquid, it was common to find undissolved creatine in the bottom of a glass, after the initial dose was ingested. To obtain the full effect of the dosage of creatine, it was then necessary to add more water to the remaining creatine in the bottom of the glass, stir the liquid to dissolve the remaining creatine, and then drink the second portion of liquid. Thus non-uniform dosages, and ingestion at non-uniform rates, are common in the prior art.

The use of an effervescent tablet, or packet of premeasured effervescent powder, assures complete and uniform dispersal of the creatine in the water, by virtue of the lowering of the pH of the liquid, and the effervescence of the liquid. The soluble effervescent will contain mixtures of acids (including but not limited to citric acid and/or tartaric acid) and sodium bicarbonate, which releases carbon dioxide when dissolved in water.

The chemical formula of creatine is $C_4 H_9 N_3 O_2$, and has a molecular weight 131.13. Prior art powder forms of creatine utilize creatine monohydrate in water, having a chemical formula of $C_4 H_9 N_3 O_2 H_2O$. Creatine monohydrate becomes anhydrous at 100° F., and has a neutral reaction to litmus. One gram of creatine monohydrate dissolves in 75 ml of water, about 9 liters of alcohol, and is insoluble in ether. When creatine monohydrate is dissolved in an aqueous solution, creatinine is formed. While aqueous and alkaline solutions contain an equilibrium mixture of creatine and creatinine, it has been found that in an acid solution, the formation of creatinine is complete.

The method of the present invention relies upon the combination of creatine within an effervescent to create an acid solution which is ingested by the consumer. The effervescent lowers the pH to form an acid solution, whereby the creatine will completely and uniformly dissolve. Thus, in its most general form, the invention includes a soluble effervescent containing creatine, an acid, or mixture of acids, and a bicarbonate for releasing carbon dioxide when dissolved in a neutral pH liquid, such as water. In the preferred form of the invention, creatine citrate is utilized, while other acidic edible salt forms of creatine may be utilized, including creatine phosphate (C4 H10 N3 O5P, which may include either a sodium salt or a calcium salt) or creatine monohydrate.

The effervescent ingredients preferably utilize a mixture of acids, including citric acid and/or tartaric acid. Either sodium bicarbonate or potassium bicarbonate may be utilized for the release of carbon dioxide. In addition, starch (cellulose, alginic acid or other disintegrating agents), stearic acid (or other lubricants for tablet compression), and flavoring agents (either natural or synthetic) are utilized in the effervescent tablet.

While the effervescent is preferably in the form of a tablet, it may also be utilized in granular/powder form. The effervescent must be stored in a tightly closed container or other moisture-proof package, since water or other liquids will

4

activate the effervescent. This is beneficial, because it permits a predetermined, premeasured amount of creatine and effervescent to be meted out within a package. In this way, the consumer will always receive the exact dosage of creatine desired, whether in tablet form or granular/powder form.

One form of creatine which has been found to accomplish the objectives of the present invention is manufactured in a 2.5 g tablet with creatine citrate, with the following composition:

| sodium carbonate | 50.0 mg |
| sodium bicarbonate | 1000.0 mg |
| citric acid | 1200.0 mg |
| dextrose | 1000.0 mg |
| creatine citrate | 2500.0 mg |
| sodium laurel sulfate | 5.0 mg |
| stevia (herbal sweetener) | 25.0 mg |
| magnesium stearate | 10.0 mg |
| natural orange flavor | 125.0 mg |

The amounts of bicarbonate and carbonate may vary by as much as 10%, with a corresponding inversely proportional variation of citric acid and the dextrose is used to compensate for tabletability. In addition, there may be a need to include polyethylene glycol in an amount up to 150 mg.

Effervescents are not to be swallowed directly, since they release carbon dioxide as they dissolve. Thus, the initial step in the method of the invention is to open a moisture-proof package containing the effervescent creatine, and dispense it into a glass of water or other pH neutral liquid. Once the effervescent creatine has completely dissolved, the solution should be swallowed immediately. As noted above, an acidic aqueous solution will eventually cause the creatine to completely convert to creatinine. While this conversion typically takes a number of hours, the longer the consumer waits to ingest the solution, the smaller the amount of beneficial creatine (and the greater the amount of undesirable creatinine) that will be present in the solution. Preferably, the solution is ingested within 15 minutes of being completely dissolved in the liquid.

Whereas the invention has been shown and described in connection with the preferred embodiment thereof, many modifications, substitutions and additions may be made which are within the intended broad scope of the appended claims.

I claim:

1. A method of enhancing delivery and uniformity of concentration of creatine in a human comprising the steps of:

dispensing a combination of an effervescent and a predetermined amount of creatine,

into a neutral pH liquid;

dissolving the combination completely in the liquid to form an acid solution; and

a human ingesting the solution.

2. The method of claim 1, wherein the dispensing step includes the initial step of opening a moisture-proof package containing the effervescent/creatine combination.

3. The method of claim 2, wherein the effervescent/creatine combination is in the form of a tablet.

4. The method of claim 2, wherein the effervescent/creatine combination is in the form of a powder.

5. The method of claim 1, wherein the dispensing step includes dispensing an effervescent tablet containing creatine citrate, and wherein the dissolving step includes dissolving the tablet in water.

Exhibit A

5,925,378

| 5 | 6 |

6. The method of claim 1, wherein the dispensing step includes dispensing a premeasured amount of effervescent powder containing creatine citrate, and wherein the dissolving step includes dissolving the powder in water.

7. The method of claim 1, wherein the ingesting step is performed immediately after the combination is completely dissolved.

8. The method of claim 1, wherein the ingesting step is performed within approximately 15 minutes after the combination is completely dissolved.

9. In combination:

an effervescent; and

creatine mixed with the effervescent in an amount which is effective to enhance a stable concentration of cellular creatine when dissolved in a neutral pH liquid and ingested by a human.

10. The combination of claim 9, wherein the effervescent is in the form of a tablet.

11. The combination of claim 9, wherein the effervescent is in the form of a powder.

12. The effervescent tablet of claim 3, wherein said creatine is in the form of an edible salt.

13. The combination of claim 9, wherein said effervescent includes an acid and a bicarbonate.

14. The combination tablet of claim 13, wherein the acid is selected from the group consisting of citric acid and tartaric acid.

15. The combination of claim 13, wherein the bicarbonate is selected from the group consisting of sodium bicarbonate and potassium bicarbonate.

16. The combination of claim 12, wherein said creatine is in the form of an acidic edible salt.

17. The combination of claim 16, wherein the creatine is selected from the group consisting of creatine monohydrate, creatine phosphate and creatine citrate.

18. The combination of claim 9, comprising an effervescent tablet including:

sodium carbonate 45–55 mg;

sodium bicarbonate 900–1100 mg;

citric acid 1080–1320 mg;

dextrose 900–1100 mg;

creatine citrate 2500 mg;

sodium laurel sulfate 5 mg;

stevia 25 mg;

magnesium stearate 10 mg;

natural orange flavor 125 mg;

polyethylene glycol 0–150 mg.

19. The combination of claim 18, wherein the amount of sodium carbonate is 50 mg, the amount of sodium bicarbonate is 1 g, the amount of citric acid is 1.2 g and the amount of dextrose is 1 g.

* * * * *

Exhibit A

*GR*

3.      Term and Termination. This Agreement shall commence as of the date listed above, and shall continue in effect for five (5) years.  Upon the two (2) year anniversary of the date listed above and each annual anniversary date thereafter (collectively,  "Anniversary Dates"), this Agreement shall automatically renew for additional one (1) year periods (a "Renewal Period") unless at least ninety (90) days prior to any anniversary either party gives written notice to the other party of its desire not to renew the Agreement. Notwithstanding the foregoing, in the event of a material breach by either party of the terms and conditions of this Agreement (a "Default"), the non-breaching party may give the other party written notice of such Default.  In the event the Default is remedied within thirty (30) days following such notice the notice shall be null and void.  If such Default is not remedied within such thirty (30) day period, the non-breaching party may terminate this Agreement upon the expiration of such remedy period.  The rights of termination referred to in this Agreement are not intended to be exclusive and are in addition to any other rights available to the parties in law or in equity.  Either party may terminate this Agreement upon notice to the other party if such other party becomes insolvent or bankrupt or files any petition in bankruptcy.

4.      Terms of Sale.  All sales of the Product from FSI to Purchaser shall be made pursuant to the terms and conditions of sale contained in this Agreement, as well as Purchaser's standard purchase order.  In the event of any conflict between the terms of a purchase order issued by Purchaser and this Agreement, this Agreement shall control.

5.      Quantity and Delivery.  The quantity of the Product sold pursuant to this Agreement shall be determined by the purchase orders issued by Purchaser.  The purchase order shall contain the quantity of units to be shipped, requested delivery date, destination, carrier and other delivery instructions.  For the purposes of this Section and as used throughout, "unit" shall mean a single dose packet of the Product.   The minimum quantity per order shall be 300,000 units.  Purchaser shall, to retain its exclusivity under this Agreement, do one of the following during each year of this Agreement: (i) show that at least 15,000,000 units in total of various nutritional products (not just the Product) were ordered and purchased by Purchaser and its affiliates (including, but not limited to, Rexall and Met-Rx) from FSI on a cumulative basis per the following: or (ii) make a non-refundable cash payment of $1,500,000 for the first year and $1,000,000 each year thereafter in which case no minimum units must be purchased during any year.  FSI's sole remedy for failure to meet such minimum requirements shall be to convert the exclusive rights granted to Purchaser hereunder into non-exclusive rights.  In either event, the minimum quantity per order shall continue to be 300,000 units.

6.      Price.  The prices for the Product are those prices agreed to by the parties and set forth in Exhibit "B", attached hereto and incorporated herein.  FSI may adjust the prices, upon written notice to the Purchaser in the event raw material or packaging prices increase or Purchaser revises or amends the specifications for the Product by making the manufacturing of the Product more expensive.  FSI shall notify Purchase in writing thirty (30) days prior to the adjusted price becoming effective.

-2-

Exhibit B

7.      Shipping and Packaging. The Product shall be shipped F.O.B. FSI's shipping point in Omaha, Nebraska. Purchaser shall be responsible for all shipping costs. FSI will package the Product according to the specifications agreed by the parties and set forth in Exhibit "C".

8.      Right to Use FSI's Trademarks, Patents or Product Names. Purchaser may use any of FSI's Trademarks, Patents, product names, tag lines, marketing or advertising information, and research or testing results (the "Intellectual Property") without FSI's express written consent. Purchaser shall be permitted to use Intellectual Property without variation in catalogues, window and shelf displays, in brochures and other advertising to identify that they offer FSI products. Purchase shall not be allowed to vary the Intellectual Property in designs, color or data without FSI's written consent. Purchase agrees to supply FSI, from time to time upon FSI's request, samples of their uses. Unless otherwise required by law and after given written notice to FSI, Purchaser shall comply with the Confidentiality and Non-Use Agreement executed by the parties.

9. .     Payment and Terms. Payment for shipments of the Product purchased hereunder shall be made thirty (30) days from the date FSI notifies Purchaser the Product is available for delivery.

10.     Non-exclusive. This Agreement shall not limit either party's right to produce, distribute, supply, and develop or otherwise deal in products similar to the Product, for example creatine or non-effervescent creatine phosphate.

11.     Acceptance/Rejection. Purchaser shall inspect each shipment of Product upon the arrival thereof at Purchaser's facility, and shall within thirty (30) days after invoice give written notice to FSI of any matter by reason whereof Purchaser may allege that the shipment of Product is not in accordance with this Agreement. If the Purchaser fails to give such notice, the shipment shall be deemed to be accepted. If a shipment is rejected, Purchaser shall give written notice thereof to FSI within thirty (30) days of such rejection, and shall hold such shipment for up to thirty (30) days pending receipt of return delivery instructions from FSI. After such time Purchaser shall return the Product to FSI at FSI's cost. FSI shall bear the cost of and risk of loss in transit with respect to all rejected shipments returned to FSI that are in fact not in all material respects in accordance with this Agreement. A rejection of any shipment shall not constitute a repudiation of this Agreement and shall not affect FSI's obligation to tender delivery of, or Purchaser's obligation to accept, any subsequent shipments.

12.     Warranties and Exclusion of Other Warranties. FSI warrants to the Purchaser as follows: (a)title to the Product conveyed under the terms of this Agreement shall be delivered free from any security interest, lien or other encumbrance on title whatsoever; (b) the Product is of good and merchantable quality, and fit for the consumer use described on the Supplement Panel; (c) the Product has been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (the "Act") (21 USC 301, et. seq.) and the requirements of any other applicable federal, state

-3-

Exhibit B

or local laws or regulations; (d) the Product packages, to the extent produced by FSI, shall bear markings and labels in accordance with the Supplement Panel and any other written instructions of the Purchaser;
(e) the Product has not been adulterated or misbranded within the meaning of the Act nor shall it constitute an article under the provisions of Sections 404 and 505 of the Act and (f) the Product is patented and involves U.S. Patent No. 5,925,378. Purchaser acknowledges responsibility for notifying FSI of any changes in the Supplement Panel or its packaging and labeling requirements.

**FSI MAKES NO OTHER WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE PRODUCT SOLD HEREUNDER.**

13.    FSI Liability.  Except with regard to any FSI indemnification obligation, FSI's liability for breach of this agreement shall be, at Purchaser's option, to replace without charge any defective shipment, pay Purchaser its lost profits, or refund the purchase price for such shipment. Furthermore, if at any time FSI accepts a purchase order issued by Purchaser and, no later than that date, the Purchaser advises FSI that it has or intends to incur certain costs (e.g., advertising on the Product) based upon FSI's agreement to deliver Product on the purchase order, FSI will be liable for consequential and incidental damages based upon its failure to meet the delivery date provided FSI's failure has not been caused by (i) the Purchaser or (ii) by or though FSI's inability to obtain any raw material needed to manufacture the product.

14.    Ownership of Proprietary Information and Trade Secrets.  The ownership of the proprietary information, trade secrets and the formula shall be governed by the provisions of Section 1.

15.    Indemnification.  Purchaser shall indemnify and hold FSI, its officers and employees harmless with respect to any liability, claim, loss, damage or expense (including attorneys' fees and other costs of defending any action) of any kind or nature caused or allegedly caused, by (i) use of the Product in contravention of Label or Supplement Panel Instructions, to the extent such use or contravention was caused by or is attributable to the Purchaser or (ii) the unauthorized use of FSI's Intellectual Property, or (iii) written or oral representations or claims by Purchaser or Purchaser's agents that the Product will perform in any manner different from that stated on the Label or Supplement Panel instructions.   FSI agrees to defend and indemnify Purchaser from and against all liability, loss and damage including reasonable counsel's fees and other costs of defending any action resulting from the sale or use of the products, any patent infringement claim relating to the Product, or any litigation based thereon, and such indemnity shall survive acceptance of the goods and payment therefore by Purchaser.

16.    Insurance. Purchaser and FSI shall at all times during the term hereof maintain in effect comprehensive general liability insurance (including product liability insurance) of not less than Two Million Dollars ($2,000,000.00) per accident or occurrence from bodily injury and property damage liability, and Worker's Compensation insurance with statutory benefits. The insurance policy shall provide that it cannot be canceled

-4-

**Exhibit B**

without at least thirty (30) days' notice to the other party. Upon execution of this Agreement and during the term hereof annually as such insurance policies are renewed, the parties will deliver to each other a certificate of insurance showing that the required insurance is in effect. Each party's coverage shall list the other party as an additional insured with respect to this Agreement. The parties shall carry policies with carriers with a "B" or better rating through Best Cumulative Rating.

17.     Force Majeure.   Failure of FSI to make or Purchaser to take, all or any part of any shipment hereunder, if such failure is due to acts of God, war, labor difficulties, breakdown or damage to FSI's warehouse facilities or Purchaser's receiving facilities, embargoes, shortages of any raw materials or energy, shortages of transportation equipment, compliance with any law or any regulation or order of any public authority or any other cause either similar or dissimilar beyond the control of the party so failing, shall not subject such party to any liability to the other party.

18.     Construction; Agents' Authority; Merger.   This instrument, along with the Purchaser's Purchase Order is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms and conditions of their agreement with respect to the sale and purchase of the Product. This Agreement can be modified or rescinded only by a writing signed by both parties. Purchaser understands and agrees that no one, other than the President of FSI has authority to bind FSI to any affirmation, representation, or warranty concerning the Product sold pursuant hereto which is not set forth herein, and Purchaser further understands and agrees that any such affirmation of fact, promise or representation made by any one other than the President which is not set forth herein shall not constitute a warranty.

a.     Assignment. Neither party may assign its rights nor delegate its duties hereunder without the other party's express written consent.

b.     Effect of Invalidity. The invalidity, in whole or in part, of any provision hereof shall not affect the validity of any other provision.

c.     Non-waiver. Waiver by either FSI or Purchaser of a breach of any provision hereof shall not be deemed a waiver of future compliance therewith, and such provision shall remain in full force and effect. The express terms hereof shall not be varied by any course of performance, dealing or usage of trade.

d.     Title. Title and risk of loss or damage to the Product shall pass to Purchaser upon shipment from FSI's shipping point.

e.     Dispute Resolution.   The parties hope there will be no disputes arising out of their business relationship. However, if a claim of breach, nonperformance, nonpayment or repudiation should arise related to or connected with this Agreement, Purchase Order or any transactions between the parties under this Agreement (a

-5-

**Exhibit B**

"Dispute") then the parties agree to attempt to informally resolve the Dispute by Directed Negotiation before initiating any claim related to such Dispute to arbitration or in a court of competent jurisdiction. Direct Negotiation, as used herein, shall mean a meeting (held either by telephone or in-person) between senior business principals designated by each party who have full authority to address and resolve the Dispute. Direct Negotiation is a prerequisite to arbitration or litigation involving all Disputes between the parties except that either party may proceed directly to a court of law or equity to seek emergency injunctive relief or remedy any safety concerns. To initiate Direct Negotiation, the complaining party shall make a written demand on the other by certified mail to the primary address of record and identify therein the nature of the Dispute and all issues which, in the opinion of the complaining party, need to be resolved to restore the business relationship. The Direct Negotiation shall take place during the thirty days following the date of receipt of the demand, at a time and place agreed to by the business principals, and each party agrees to negotiate in good faith in an attempt to resolve the Dispute. The parties agree to exchange relevant information and cooperate in good faith to resolve the Dispute under this provision and to that end, the non-complaining party shall issue a statement which addresses the complaining party's identified Dispute and/or raises additional issues for resolution prior to the Direct negotiation. If the Dispute remains unresolved following Direct Negotiation or if the Direct Negotiation is not completed within the specified 30-day time period, then the aggrieved parties are released to file suit if they choose to further pursue the Dispute.

     **f.**    **Applicable Law; Jurisdiction and Venue.** The parties agree that if one party shall initiate an arbitration or bring an action against the other party for breach of this Agreement, the laws of the state of the party initiating the action shall govern the interpretation of this Agreement and the state courts of the state of the initiating party shall be considered a proper venue for bringing the arbitration or action.

     **g.**    **Notice.** Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall be mailed first class or express mail, postage prepaid, or sent by telex, telegram, telecopy or other similar form of rapid transmission which is confirmed at the time of the transmission and which is further confirmed by mailing (by registered or certified mail, postage prepaid) at substantially the same time as such rapid transmission, or personally delivered to an officer of the receiving party. All such communication shall be mailed, sent or delivered:

If to FSI; Fortress Systems, L.L.C.

            Attn: Michael Carnazzo
            14920 Grover Street
            Omaha, Nebraska 68127
            Fax: (402) 333-3536

**Exhibit B**

## AMENDMENT TO DEVELOPMENT AND SUPPLY AGREEMENT

WHEREAS, General Nutrition Corporation, having its principal place of business at 300 Sixth Avenue, Pittsburgh, PA, 15222, hereinafter "GNC", and Fortress Systems, LLC, a Nebraska limited liability company, having its principal place of business at 14920 Grover Street, Omaha, NE 68144, hereinafter "FSI" entered into a Development and Supply Agreement, the "Agreement", dated August 10, 2001, said Agreement is incorporated herein by reference, whereby GNC agreed to purchase from FSI certain quantities of Product from FSI on an annual basis,

NOW WHEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto, the parties agree to amend the Agreement as set forth below.

Paragraph 5, "Quantity and Delivery" is hereby deleted in its entirety and the following substituted.

5. Quantity and Delivery.  The quantity of the Product sold pursuant to this Agreement shall be determined by the purchase orders issued by GNC.  The purchase order shall contain the quantity of units to be shipped, requested delivery date, destination, carrier and other delivery instructions.  GNC guarantees to purchase not less than One-Hundred Thousand dollars ($100,000.00) of Product from FSI each month, beginning October, 2003 and each month thereafter, throughout the term of the Agreement. If GNC orders less than $100,000 in one month, GNC is to compensate monetarily for that shortage the first of the following month. The exclusivity will no longer be in place for the formulas GNC was given exclusivity for.

All other sections of the Agreement shall remain in full force and effect. GNC also agrees to pay FSI for discontinued packaging inventory currently on hand and other expenses FSI incurred granting GNC exclusivity, while GNC failed to meet the contracted volumes they agreed to. See attached inventory valuation.

IN WITNESS WHEREOF, the parties have executed this Agreement as of 29th day of October 2003.

FORTRESS SYSTEMS, LLC                    GENERAL NUTRITION CORPORATION

By: _____           By: _____
Michael S. Carnazzo, President           Title  10-31-'03

Exhibit B

If to Purchaser:                         General Nutrition Corporation
                                         Attn: General Counsel
                                         300 Sixth Avenue
                                         Pittsburgh, Philadelphia 15222
                                         Fax:  (412) 338-8900

Any notice given by mail shall be deemed to be given the earlier of the day when received or five (5) business days after deposit with the U.S. Postal Service, and any notice sent by rapid transmission shall be deemed to be given when receipt of such transmission is acknowledged or confirmed (either at the time of transmission or subsequently), and any communication delivered in person shall be deemed to be given when received for by, or actually received by, an officer of a party.

      **h.**    <u>Survival.</u>  The obligations of the parties under Sections  8, 10, 12, 14, 15, 16, 17 and 18 hereof shall survive any termination of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

                          FORTRESS SYSTEMS, L.L.C.

                          By: _____
                            Michael Carnazzo, Authorized Representative

                          GENERAL NUTRITION CORPORATION

                          By: _____
                          Its _____ C. E. O.

**Exhibit B**

# EXHIBIT A

## SUPPLEMENT PANEL

Supplement Panels to be provided with Acceptance of Product formula and Flavor

FSI   _MSC_

PURCHASER

Exhibit B

## EXHIBIT B PRICING SCHEDULE

All pricing for products that fall under this contract volume will be submitted upon final approval of flavor and content

All new products will be a minimum of 8 weeks from acceptance of GNC's P.O. and approved artwork

All reorder P.O.'s will be 6 to 8 weeks from accepted date of the P.O.

FSI _M.S.C_

PURCHASER

-9-

Exhibit B

# EXHIBIT C

## PACKAGING AND PRINTING SPECIFICATIONS

All new products must have approved artwork in the printer's format; any extra cost due to artwork non-conformance will be paid for by GNC
GNC is responsible for any packaging that becomes out dated or non-useful due to changes in artwork, colors, or label claims.

FSI___ _M SC_ _____          PURCHASER _____

-10-

Exhibit B

# DEVELOPMENT AND SUPPLY AGREEMENT

This DEVELOPMENT AND SUPPLY AGREEMENT (the "Agreement") dated August 10, 2001, between Fortress Systems, L.L.C. a Nebraska limited liability company ("FSI"), and General Nutrition Corporation (the "Purchaser"), having its principal place of business at 300 Sixth Avenue, Pittsburgh, PA 15222.

WHEREAS, FSI develops, produces, markets and distributes various nutritional supplements and other products;

WHEREAS, the Purchaser desires to have FSI manufacture for it an effervescent creatine phosphate product ("Product") pursuant to the formula described in Section 1 below;

WHEREAS, Purchaser desires to purchase all of Purchaser's requirements of the Product in the same form and with the same specifications as the final approved samples of the Product provided to the Purchaser and in accordance with the Supplement Panel supplied by FSI and attached hereto as Exhibit "A";

WHEREAS, Purchaser desires to purchase exclusively from FSI all of its requirements for the Product for its world market during the term of this Agreement and FSI will produce the Product exclusively for Purchaser.

NOW, THEREFORE, in consideration of the premises and mutual agreements contained herein and other good and valuable consideration, the receipt and sufficiency are hereby acknowledged, the parties agree as follows:

1.      **Development of the Product**. FSI and Purchaser have developed a formula and methodology for the Product, according to specifications provided by the Purchaser.  These specifications included a required percentage of effervescent Creatine and phosphates per dose, and taste, color and packaging requirements.  The Purchaser is sole owner of the Product formula. FSI acknowledges that Purchaser shall have the ownership and use of the formula, but FSI does not relinquish any protective rights under the patent law that protects this patented product.  Purchaser agrees that it will not permit a third party which is not an affiliate, to have the Product manufactured and sold

2.      **Purchase of Requirements**. Upon acceptance of the Product as provided in Section 1, Purchaser shall purchase Product pursuant to Section 6 of this Agreement. FSI shall satisfy Purchaser's requirements during the term hereof. Purchaser agrees not to manufacture, produce or otherwise obtain the Product except as specifically provided by this Agreement. For the purposes of this Section and as used throughout this Agreement, "Purchaser" shall mean the General Nutrition Corporation and any of its affiliates which elect to purchase the Product. Purchaser shall be exclusive distributor of the Product worldwide in all channels of trade. Purchaser shall not manufacture or distribute any other private label product containing effervescent creatine phosphate; however, Purchaser may distribute other third party effervescent creatine products in its retail stores.

Exhibit B

*GR*

3.    Term and Termination. This Agreement shall commence as of the date listed above, and shall continue in effect for five (5) years.  Upon the two (2) year anniversary of the date listed above and each annual anniversary date thereafter (collectively,  "Anniversary Dates"), this Agreement shall automatically renew for additional one (1) year periods (a "Renewal Period") unless at least ninety (90) days prior to any anniversary either party gives written notice to the other party of its desire not to renew the Agreement. Notwithstanding the foregoing, in the event of a material breach by either party of the terms and conditions of this Agreement (a "Default"), the non-breaching party may give the other party written notice of such Default.  In the event the Default is remedied within thirty (30) days following such notice the notice shall be null and void.  If such Default is not remedied within such thirty (30) day period, the non-breaching party may terminate this Agreement upon the expiration of such remedy period. The rights of termination referred to in this Agreement are not intended to be exclusive and are in addition to any other rights available to the parties in law or in equity.  Either party may terminate this Agreement upon notice to the other party if such other party becomes insolvent or bankrupt or files any petition in bankruptcy.

4.    Terms of Sale.  All sales of the Product from FSI to Purchaser shall be made pursuant to the terms and conditions of sale contained in this Agreement, as well as Purchaser's standard purchase order.  In the event of any conflict between the terms of a purchase order issued by Purchaser and this Agreement, this Agreement shall control.

5.    Quantity and Delivery.  The quantity of the Product sold pursuant to this Agreement shall be determined by the purchase orders issued by Purchaser.  The purchase order shall contain the quantity of units to be shipped, requested delivery date, destination, carrier and other delivery instructions. For the purposes of this Section and as used throughout, "unit" shall mean a single dose packet of the Product.  The minimum quantity per order shall be 300,000 units.  Purchaser shall, to retain its exclusivity under this Agreement, do one of the following during each year of this Agreement: (i) show that at least 15,000,000 units in total of various nutritional products (not just the Product) were ordered and purchased by Purchaser and its affiliates (including, but not limited to, Rexall and Met-Rx) from FSI on a cumulative basis *per the following* or (ii) make a non-refundable cash payment of $1,500,000 for the first year and $1,000,000 each year thereafter in which case no minimum units must be purchased during any year.  FSI's sole remedy for failure to meet such minimum requirements shall be to convert the exclusive rights granted to Purchaser hereunder into non-exclusive rights.  In either event, the minimum quantity per order shall continue to be 300,000 units.

6.    Price.  The prices for the Product are those prices agreed to by the parties and set forth in Exhibit "B", attached hereto and incorporated herein.  FSI may adjust the prices, upon written notice to the Purchaser in the event raw material or packaging prices increase or Purchaser revises or amends the specifications for the Product by making the manufacturing of the Product more expensive.  FSI shall notify Purchase in writing thirty (30) days prior to the adjusted price becoming effective.

-2-

Exhibit B

7.  <u>Shipping and Packaging</u>. The Product shall be shipped F.O.B. FSI's shipping point in Omaha, Nebraska. Purchaser shall be responsible for all shipping costs. FSI will package the Product according to the specifications agreed by the parties and set forth in Exhibit "C".

8.  <u>Right to Use FSI's Trademarks, Patents or Product Names</u>. Purchaser may use any of FSI's Trademarks, Patents, product names, tag lines, marketing or advertising information, and research or testing results (the "Intellectual Property") without FSI's express written consent. Purchaser shall be permitted to use Intellectual Property without variation in catalogues, window and shelf displays, in brochures and other advertising to identify that they offer FSI products. Purchase shall not be allowed to vary the Intellectual Property in designs, color or data without FSI's written consent. Purchase agrees to supply FSI, from time to time upon FSI's request, samples of their uses. Unless otherwise required by law and after given written notice to FSI, Purchaser shall comply with the Confidentiality and Non-Use Agreement executed by the parties.

9.  <u>Payment and Terms</u>. Payment for shipments of the Product purchased hereunder shall be made thirty (30) days from the date FSI notifies Purchaser the Product is available for delivery.

10. <u>Non-exclusive</u>. This Agreement shall not limit either party's right to produce, distribute, supply, and develop or otherwise deal in products similar to the Product, for example creatine or non-effervescent creatine phosphate.

11. <u>Acceptance/Rejection</u>. Purchaser shall inspect each shipment of Product upon the arrival thereof at Purchaser's facility, and shall within thirty (30) days after invoice give written notice to FSI of any matter by reason whereof Purchaser may allege that the shipment of Product is not in accordance with this Agreement. If the Purchaser fails to give such notice, the shipment shall be deemed to be accepted.   If a shipment is rejected, Purchaser shall give written notice thereof to FSI within thirty (30) days of such rejection, and shall hold such shipment for up to thirty (30) days pending receipt of return delivery instructions from FSI. After such time Purchaser shall return the Product to FSI at FSI's cost.   FSI shall bear the cost of and risk of loss in transit with respect to all rejected shipments returned to FSI that are in fact not in all material respects in accordance with this Agreement. A rejection of any shipment shall not constitute a repudiation of this Agreement and shall not affect FSI's obligation to tender delivery of, or Purchaser's obligation to accept, any subsequent shipments.

12. <u>Warranties and Exclusion of Other Warranties</u>. FSI warrants to the Purchaser as follows: (a) title to the Product conveyed under the terms of this Agreement shall be delivered free from any security interest, lien or other encumbrance on title whatsoever; (b) the Product is of good and merchantable quality, and fit for the consumer use described on the Supplement Panel; (c) the Product has been manufactured, packaged, stored and shipped in accordance with the applicable standards of Good Manufacturing Practices promulgated under the Food, Drug and Cosmetic Act (the "Act") (21 USC 301, et. seq.) and the requirements of any other applicable federal, state

-3-

**Exhibit B**

or local laws or regulations; (d) the Product packages, to the extent produced by FSI, shall bear markings and labels in accordance with the Supplement Panel and any other written instructions of the Purchaser; (e) the Product has not been adulterated or misbranded within the meaning of the Act nor shall it constitute an article under the provisions of Sections 404 and 505 of the Act and (f) the Product is patented and involves U.S. Patent No. 5,925,378. Purchaser acknowledges responsibility for notifying FSI of any changes in the Supplement Panel or its packaging and labeling requirements.

**FSI MAKES NO OTHER WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE PRODUCT SOLD HEREUNDER.**

13.     FSI Liability.  Except with regard to any FSI indemnification obligation, FSI's liability for breach of this agreement shall be, at Purchaser's option, to replace without charge any defective shipment, pay Purchaser its lost profits, or refund the purchase price for such shipment.  Furthermore, if at any time FSI accepts a purchase order issued by Purchaser and, no later than that date, the Purchaser advises FSI that it has or intends to incur certain costs (e.g., advertising on the Product) based upon FSI's agreement to deliver Product on the purchase order, FSI will be liable for consequential and incidental damages based upon its failure to meet the delivery date provided FSI's failure has not been caused by (i) the Purchaser or (ii) by or though FSI's inability to obtain any raw material needed to manufacture the product.

14.     Ownership of Proprietary Information and Trade Secrets.  The ownership of the proprietary information, trade secrets and the formula shall be governed by the provisions of Section 1.

15.     Indemnification.  Purchaser shall indemnify and hold FSI, its officers and employees harmless with respect to any liability, claim, loss, damage or expense (including attorneys' fees and other costs of defending any action) of any kind or nature caused or allegedly caused, by (i) use of the Product in contravention of Label or Supplement Panel Instructions, to the extent such use or contravention was caused by or is attributable to the Purchaser or (ii) the unauthorized use of FSI's Intellectual Property, or (iii) written or oral representations or claims by Purchaser or Purchaser's agents that the Product will perform in any manner different from that stated on the Label or Supplement Panel instructions.   FSI agrees to defend and indemnify Purchaser from and against all liability, loss and damage including reasonable counsel's fees and other costs of defending any action resulting from the sale or use of the products, any patent infringement claim relating to the Product, or any litigation based thereon, and such indemnity shall survive acceptance of the goods and payment therefore by Purchaser.

16.     Insurance.  Purchaser and FSI shall at all times during the term hereof maintain in effect comprehensive general liability insurance (including product liability insurance) of not less than Two Million Dollars ($2,000,000.00) per accident or occurrence from bodily injury and property damage liability, and Worker's Compensation insurance with statutory benefits. The insurance policy shall provide that it cannot be canceled

-4-

**Exhibit B**

without at least thirty (30) days' notice to the other party. Upon execution of this Agreement and during the term hereof annually as such insurance policies are renewed, the parties will deliver to each other a certificate of insurance showing that the required insurance is in effect. Each party's coverage shall list the other party as an additional insured with respect to this Agreement. The parties shall carry policies with carriers with a "B" or better rating through Best Cumulative Rating.

17.     <u>Force Majeure.</u>  Failure of FSI to make or Purchaser to take, all or any part of any shipment hereunder, if such failure is due to acts of God, war, labor difficulties, breakdown or damage to FSI's warehouse facilities or Purchaser's receiving facilities, embargoes, shortages of any raw materials or energy, shortages of transportation equipment, compliance with any law or any regulation or order of any public authority or any other cause either similar or dissimilar beyond the control of the party so failing, shall not subject such party to any liability to the other party.

18.     <u>Construction; Agents' Authority; Merger.</u>  This instrument, along with the Purchaser's Purchase Order is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms and conditions of their agreement with respect to the sale and purchase of the Product. This Agreement can be modified or rescinded only by a writing signed by both parties. Purchaser understands and agrees that no one, other than the President of FSI has authority to bind FSI to any affirmation, representation, or warranty concerning the Product sold pursuant hereto which is not set forth herein, and Purchaser further understands and agrees that any such affirmation of fact, promise or representation made by any one other than the President which is not set forth herein shall not constitute a warranty.

a.     <u>Assignment.</u> Neither party may assign its rights nor delegate its duties hereunder without the other party's express written consent.

b.     <u>Effect of Invalidity</u>. The invalidity, in whole or in part, of any provision hereof shall not affect the validity of any other provision.

c.     <u>Non-waiver.</u> Waiver by either FSI or Purchaser of a breach of any provision hereof shall not be deemed a waiver of future compliance therewith, and such provision shall remain in full force and effect. The express terms hereof shall not be varied by any course of performance, dealing or usage of trade.

d.     <u>Title.</u> Title and risk of loss or damage to the Product shall pass to Purchaser upon shipment from FSI's shipping point.

e.     <u>Dispute Resolution.</u>  The parties hope there will be no disputes arising out of their business relationship. However, if a claim of breach, nonperformance, nonpayment or repudiation should arise related to or connected with this Agreement, Purchase Order or any transactions between the parties under this Agreement (a

-5-

Exhibit B

"Dispute") then the parties agree to attempt to informally resolve the Dispute by Directed Negotiation before initiating any claim related to such Dispute to arbitration or in a court of competent jurisdiction. Direct Negotiation, as used herein, shall mean a meeting (held either by telephone or in-person) between senior business principals designated by each party who have full authority to address and resolve the Dispute. Direct Negotiation is a prerequisite to arbitration or litigation involving all Disputes between the parties except that either party may proceed directly to a court of law or equity to seek emergency injunctive relief or remedy any safety concerns. To initiate Direct Negotiation, the complaining party shall make a written demand on the other by certified mail to the primary address of record and identify therein the nature of the Dispute and all issues which, in the opinion of the complaining party, need to be resolved to restore the business relationship. The Direct Negotiation shall take place during the thirty days following the date of receipt of the demand, at a time and place agreed to by the business principals, and each party agrees to negotiate in good faith in an attempt to resolve the Dispute. The parties agree to exchange relevant information and cooperate in good faith to resolve the Dispute under this provision and to that end, the non-complaining party shall issue a statement which addresses the complaining party's identified Dispute and/or raises additional issues for resolution prior to the Direct negotiation. If the Dispute remains unresolved following Direct Negotiation or if the Direct Negotiation is not completed within the specified 30-day time period, then the aggrieved parties are released to file suit if they choose to further pursue the Dispute.

      **f.**    **Applicable Law; Jurisdiction and Venue.** The parties agree that if one party shall initiate an arbitration or bring an action against the other party for breach of this Agreement, the laws of the state of the party initiating the action shall govern the interpretation of this Agreement and the state courts of the state of the initiating party shall be considered a proper venue for bringing the arbitration or action.

      **g.**    **Notice.** Any notice required or permitted to be given pursuant to this Agreement shall be in writing and shall be mailed first class or express mail, postage prepaid, or sent by telex, telegram, telecopy or other similar form of rapid transmission which is confirmed at the time of the transmission and which is further confirmed by mailing (by registered or certified mail, postage prepaid) at substantially the same time as such rapid transmission, or personally delivered to an officer of the receiving party. All such communication shall be mailed, sent or delivered:

If to FSI; Fortress Systems, L.L.C.

                       Attn: Michael Carnazzo   *M & C*
                       14920 Grover Street
                       Omaha, Nebraska 68127
                       Fax: (402) 333-3536

Exhibit B

## AMENDMENT TO DEVELOPMENT AND SUPPLY AGREEMENT

WHEREAS, General Nutrition Corporation, having its principal place of business at 300 Sixth Avenue, Pittsburgh, PA, 15222, hereinafter "GNC", and Fortress Systems, LLC, a Nebraska limited liability company, having its principal place of business at 14920 Grover Street, Omaha, NE 68144, hereinafter "FSI" entered into a Development and Supply Agreement, the "Agreement", dated August 10, 2001, said Agreement is incorporated herein by reference, whereby GNC agreed to purchase from FSI certain quantities of Product from FSI on an annual basis,

NOW WHEREFORE, for good and valuable consideration, the receipt and sufficiency of which is acknowledged by the parties hereto, the parties agree to amend the Agreement as set forth below.

Paragraph 5, "Quantity and Delivery" is hereby deleted in its entirety and the following substituted.

    5. Quantity and Delivery. The quantity of the Product sold pursuant to this Agreement shall be determined by the purchase orders issued by GNC. The purchase order shall contain the quantity of units to be shipped, requested delivery date, destination, carrier and other delivery instructions. GNC guarantees to purchase not less than One-Hundred Thousand dollars ($100,000.00) of Product from FSI each month, beginning October, 2003 and each month thereafter, throughout the term of the Agreement. If GNC orders less than $100,000 in one month, GNC is to compensate monetarily for that shortage the first of the following month. The exclusivity will no longer be in place for the formulas GNC was given exclusivity for.

All other sections of the Agreement shall remain in full force and effect.
GNC also agrees to pay FSI for discontinued packaging inventory currently on hand and other expenses FSI incurred granting GNC exclusivity, while GNC failed to meet the contracted volumes they agreed to. See attached inventory valuation.

IN WITNESS WHEREOF, the parties have executed this Agreement as of 29th day of October 2003.

FORTRESS SYSTEMS, LLC          GENERAL NUTRITION CORPORATION

By: _____      By: _____
Michael S. Carnazzo, President      Title ____ 10-31-'03 _____

**Exhibit B**

If to Purchaser:     General Nutrition Corporation
          Attn: General Counsel
          300 Sixth Avenue
          Pittsburgh, Philadelphia 15222
          Fax: (412) 338-8900

Any notice given by mail shall be deemed to be given the earlier of the day when received or five (5) business days after deposit with the U.S. Postal Service, and any notice sent by rapid transmission shall be deemed to be given when receipt of such transmission is acknowledged or confirmed (either at the time of transmission or subsequently), and any communication delivered in person shall be deemed to be given when received for by, or actually received by, an officer of a party.

  **h.**  **Survival.** The obligations of the parties under Sections 8, 10, 12, 14, 15, 16, 17 and 18 hereof shall survive any termination of this Agreement.

    IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

      FORTRESS SYSTEMS, L.L.C.

      By: _____
      Michael Carnazzo, Authorized Representative

      GENERAL NUTRITION CORPORATION

      By: _____
      Its _____ C.E.O.

**Exhibit B**

# EXHIBIT A

## SUPPLEMENT PANEL

Supplement Panels to be provided with Acceptance of Product formula and Flavor

FSI  *M S C*

PURCHASER

-8-

Exhibit B

## EXHIBIT B PRICING SCHEDULE

All pricing for products that fall under this contract volume will be submitted upon final approval of flavor and content

All new products will be a minimum of 8 weeks from acceptance of GNC's P.O. and approved artwork

All reorder P.O.'s will be 6 to 8 weeks from accepted date of the P.O.

FSI _MRSC_

PURCHASER

-9-

Exhibit B

# EXHIBIT C

## PACKAGING AND PRINTING SPECIFICATIONS

All new products must have approved artwork in the printer's format; any extra cost due
to artwork non-conformance will be paid for by GNC
GNC is responsible for any packaging that becomes out dated or non-useful due to
changes in artwork, colors, or label claims.

FSI _____            PURCHASER _____

-10-

**Exhibit B**

Help | GNC Gold Card | GNC Gift Card | Store Locator | Careers | My Account | Shopping Cart [0 items]

**GNC** LiveWell

request a catalog    signup for email    products    GNC library    SEARCH ›

VITAMINS & MINERALS    SPORTS NUTRITION    DIET & ENERGY    Herbal Supplements    HEALTH & BEAUTY    HEALTH CONCERNS

Home > Nitric Oxide

## GNC Library

healthnotes'

- Supplement
  Safetychecker
- Creatine For Sports
  Glutamine For Sports
  And Fitness



### GNC Pro Performance® Nitro Explosion™ - Grape
840 grams
Regular Price: $59.99
Sale Price: **$39.97**
Gold Card Price: $31.98 Details

⊙ **BOGO 50% OFF*** (See Promotion Details)

AVAILABILITY: IN STOCK
Leaves warehouse in 1 - 2 full bus. days. (Details)

Email this product to a friend.

Quantity:  1

ADD ITEM TO CART ›



**GNC Pro Performance® 100% Whey Protein - Chocolate**

Regular Price: $29.99 - $43.99

⊞ Details

Description    Product Info    Label

As a dietary supplement, mix 1 scoop (21g) in 4 - 6 ounces of cold water or your favorite beverage on an empty stomach approximately 30-45 minutes prior to your workout.



**GNC Pro Performance® HMB**
240 Tablets
Regular Price: $45.99

⊞ Details

## Supplement Facts

Serving Size  21 grams
Servings Per Container  40

| Amount Per Serving | | % DV |
| --- | --- | --- |
| **Calories** | 38.00 | 3% |
| **Total Carbohydrate** | 9.50 g | |
| Sugars | 0.50 g | |
| Calcium | 100.00 mg | 10% |
| Riboflavin | 0.43 mg | 25% |
| Vitamin B-6 | 0.50 mg | 25% |
| Folic Acid | 100.00 mcg | 25% |
| Vitamin B-12 | 1.50 mcg | 25% |
| Phosphorus | 250.00 mg | 25% |
| Magnesium | 100.00 mg | 25% |
| Sodium | 140.00 mg | 6% |
| Potassium | 48.00 mg | 1% |
| Creatine Monohydrate | 2.00 g | ** |
| L-Arginine | 1000.00 mg | ** |
| L-Glutamine | 1000.00 mg | ** |
| L-Tyrosine Alpha Ketoglutarate | 1000.00 mg | ** |
| L-Taurine Ethyl Ester HCL | 1000.00 mg | ** |
| Alpha Keto Glutarate (AKG) | 1000.00 mg | ** |
| Betaine | 500.00 mg | ** |
| Ornithine | 500.00 mg | ** |
| Glucuronolactone | 400.00 mg | ** |
| L-Carnitine | 250.00 mg | ** |
| Caffeine | 100.00 mg | ** |
| Vincamine | 10.00 mg | ** |
| Nicotinamide Adenine Dinucleotide | 2.00 mg | ** |
| Gynostemma Pentaphyllum | 400.00 mcg | ** |
| alpha-Lipoic Acid | 400.00 mcg | ** |

** Daily Value (DV) not established

**Other Ingredients:** Natural and Artificial Flavors, Magnesium Oxide, Potassium Phosphate, Magnesium Glycerol Phosphate, Citric Acid, Sodium Bicarbonate, MCT Oil (Medium Chain Triglycerides), Aspartame, Vitamin B-12, FD&C Red #40, Riboflavin, Acesulfame Potassium, Calcium Silicate, Potassium Citrate, Calcium

**Exhibit C**

**Storage Instructions:** Store in a cool dry place.

Significant product settling may occur.

**Warning:** After opening, keep tightly closed in refrigerator or other cool place.

Consult your physician before use. For healthy adult use only. Not for use by children. Do not use for more than 6 months. Do not use if you have high blood pressure, heart problems, are taking medication, have a medical condition, are pregnant, nursing, or are contemplating becoming pregnant. Do not exceed recommended intake. Discontinue two weeks prior to surgery.

Phenylketonurics: Contains Phenylalanine.

1-877-GNC-4700      Contact GNC      Terms & Conditions      Privacy Statement      About GNC      Investor Relations      Affiliates

©1997-2006 General Nutrition Centers, Inc.

HACKER
SAFE
TESTED 31-JUL

**Exhibit C**

Lot No. / Best By:

**PRO PERFORMANCE®**

# NITRO EXPLOSION™

DIETARY SUPPLEMENT

GET YOUR WORKOUT PUMPING

EXPLOSIVE BLEND OF L-ARGININE AND CREATINE

SUGAR-FREE

PRE-WORKOUT FORMULA

NATURAL AND ARTIFICIAL FLAVOR
**GRAPE**

NET WT 1.85 LB (30 OZ) 840 G

CODE 762406

DGG

Pro Performance® Nitro Explosion™ gets your workout pumping and helps you experience creatine like you never have before. Each serving features an explosive blend of creatine, glucuronolactone, inosine, caffeine and key amino acids including L-arginine. Creatine is known to increase athletic performance.* L-arginine is an essential precursor of nitric oxide which helps maintain blood vessel tone. This powerful formula is also equipped with electrolytes that the body can lose during intense workouts. Electrolytes help to regulate body fluids and important functions, such as muscle contraction. To get your workout pumping, take Nitro Explosion™ on an empty stomach, 30-45 minutes before your strenuous activity.

* These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure, or prevent any disease.

**WARNING:** Consult your physician before use. For healthy adult use only. Not for use by children. Do not use for more than 6 months. Do not use if you have high blood pressure, heart problems, are taking medication, have a medical condition, are pregnant, nursing, or are contemplating becoming pregnant. Do not exceed recommended intake. Discontinue use two weeks prior to surgery.

**DIRECTIONS:** As a dietary supplement, mix 1 scoop (21g) in 4 - 6 ounces of cold water or your favorite beverage on an empty stomach approximately 30-45 minutes prior to your workout.

## Supplement Facts

Serving Size: One Scoop (21g)
Servings Per Container: 40

| | Amount Per Serving | % Daily Value |
|---|---|---|
| Calories | 36 | |
| Total Carbohydrate | 8.5 g | 3%* |
| Sugars | <0.5 g | |
| Calcium | 100 mg | 10% |
| Riboflavin | 8.425 mg | 25% |
| Vitamin B6 | 6.5 mg | 25% |
| Folic Acid | 100 mcg | 25% |
| Vitamin B12 | 1.5 mcg | 25% |
| Phosphorus | 250 mg | 25% |
| Magnesium | 100 mg | 25% |
| Sodium | 140 mg | 8% |
| Potassium | 45 mg | 1% |

| | |
|---|---|
| Creatine Monohydrate | 2 g |
| L-Leucine | 1000 mg |
| L-Glutamine | 1000 mg |
| L-Tyrosine | 1000 mg |
| L-Lysine | 1000 mg |
| L-Glycine | 1000 mg |
| Sodium Bicarbonate | 1000 mg |
| Betaine | 500 mg |
| Creatine | 500 mg |
| Glucuronolactone | 400 mg |
| L-Carnitine | 325 mg |
| Taurine | 100 mg |
| Inosine | 100 mg |
| Grapeseed Extract | 50 mg |
| Bioperine® (black pepper) Extract | 10 mg |
| Creatine-alpha-ketoglutarate | 400 mcg |
| Folic Acid | 400 mcg |

*Percent Daily Values are based on a 2,000 calorie diet.
† Daily Values not established.

**OTHER INGREDIENTS:** Maltodextrin, Citric Acid, Natural and Artificial Flavor, Calcium Phosphate, Sodium Bicarbonate, Magnesium Oxide, Potassium Chloride, Calcium Silicate, Magnesium Glycerophosphate, Aspartame, Acesulfame Potassium, Pyridoxine Hydrochloride, Riboflavin, FD&C Red 40, FD&C Blue 1, Vitamin B12 and Folic Acid.

Phenylketonurics: Contains Phenylalanine.

KEEP OUT OF REACH OF CHILDREN. Store in a cool, dry place.

Notice: Significant product settling may occur.

Place UPC Here

0 48107 07053 3

For More Information:
1-800-645-5544
General Nutrition Corporation
Distributed by:
Pittsburgh, PA 15222
Made in U.S.A.
Visit us at www.gnc.com

Exhibit C

**GNC** LiveWell.    request a catalog · signup for email · products ○ GNC library    | SEARCH ▷

VITAMINS & MINERALS · SPORTS NUTRITION · DIET & ENERGY · HERBAL SUPPLEMENTS · HEALTH & BEAUTY · HEALTH CONCERNS

Best-Sellers | Multivitamins | Vitamins A-Z | Antioxidants | Fatty Acids & Oils | More

Home > Nitric Oxide

**GNC Library**

healthnotes®

- Supplement
  Safetychecker
- Creatine For Sports
  Glutamine For Sports
  And Fitness



### GNC Pro Performance® Nitro Explosion™ - Grape
840 grams
Regular Price: $59.99
Sale Price: **$39.97**
Gold Card Price: $31.98 Details

*⑤ **BOGO 50% OFF*** (See Promotion Details)

AVAILABILITY: **IN STOCK**
Leaves warehouse in 1 - 2 full bus. days. (Details)

Email this product to a friend.

Quantity: 1

[ ADD ITEM TO CART ]



**GNC Pro
Performance® 100%
Whey Protein -
Chocolate**

Regular Price: $29.99 -
$43.99

⊞ Details

| Description | Product Info | Label

- Gets your workout pumping and helps you experience creatine like you
  never have before.
- An explosive blend of L-Arginine and Creatine
- Sugar-free
- Pre-Workout Formula
- Features a blend of creatine, glucuronolactone, vincamine, caffeine and
  key amino acids including L-arginine.
- Equipped with electrolytes that the body can lose during intense
  workouts.

- **Creatine** is known to increase athletic performance.*L-arginine is an
  essential precursor of nitric oxide which helps maintain blood vessel
  tone.***Electrolytes** help to regulate body fluids and important functions,
  such as muscle contraction.*

- To get your workout pumping, take Nitro Explosion™, on an empty
  stomach, 30-45 minutes before your strenuous activity.

  * These statements have not been evaluated by the Food and Drug
  Administration. This product is not intended to diagnose, treat, cure, or prevent
  any disease.



**GNC Pro
Performance® HMB**
240 Tablets
Regular Price: $45.99

⊞ Details

HACKER
SAFE
TESTED 31-JUL

**Exhibit C**